NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

---

IN RE: MH2021-008085

No. 1 CA-MH 21-0081
FILED 6-21-2022

---

Appeal from the Superior Court in Maricopa County
No. MH2021-008085
The Honorable Christian Bell, Judge *Pro Tempore*

**AFFIRMED**

---

COUNSEL

Maricopa County Attorney's Office, Phoenix
By Joseph Branco
*Counsel for Appellee*

Maricopa County Legal Defender's Office, Phoenix
By Cynthia D. Beck
*Counsel for Appellant*

_____

**MEMORANDUM DECISION**

Judge Jennifer M. Perkins delivered the decision of the Court, in which Presiding Judge David D. Weinzweig and Judge Brian Y. Furuya joined.

_____

**P E R K I N S**, Judge:

¶1          A.H. appeals the superior court's order committing him to involuntary treatment and argues the record lacks sufficient evidence to support the order. For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶2          "We view the facts in a light most favorable to upholding the court's ruling." *In re MH2009-002120*, 225 Ariz. 284, 290, ¶ 17 (App. 2010).

¶3          In October 2021, A.H.'s mother ("Mother") applied for an involuntary evaluation of A.H. at an urgent psychiatric care center. Among other concerns, her application stated A.H. is a diagnosed schizophrenic who refuses to take his medication and uses marijuana. Her application also stated A.H. "has threatened harm to family if [they] don't leave him alone," and A.H. does not eat, sleep, or bathe. Mother also shared that A.H. once reported to a hospital that his bones turned into Jell-O. The psychiatric care center then petitioned the superior court for a court-ordered evaluation, which the court granted.

¶4          Drs. Marie Roy Babbitt and Kevin Yang performed the court-ordered evaluations, and both completed affidavits for the subsequent petition for court-ordered treatment. In her affidavit, Babbitt noted that despite A.H. being currently "alert and oriented to person, place, and time," he "has a history of paranoia, insomnia, disorganization, hallucinations, and poor self-care." Babbitt observed that A.H. appeared "mildly anxious and disorganized" and although cooperative with the interview, he repeatedly refused voluntary treatment and was "unable to make an informed decision" about treatment. Babbitt included numerous quotes to highlight A.H.'s hallucinations, such as, "I have a virus in my mouth and it's going to eat me if I eat that food," and, "I want to go to a different world." A.H. also shared the following anecdote with Babbitt in response to a question about Mother's concerns:

> Something else new she thought was crazy, was that I gave
> her two scenarios. It was just something we could talk about,

if you could either end up on Mars or have your eyes and ears and head tampered with, which would be worse? Even if that happened, you could still have peace of mind. It's the same situation, you can't move around. You just need peace of mind. Me being 19 years old, I could cope and deal with it, but a baby wouldn't know how to deal with it. The baby learns by socializing and playing with dolls. I'm just being prepared so the baby is ready. It's literally something people could think about.

¶5 Babbitt concluded A.H. suffers from "(Probable Diagnosis) Unspecified Schizophrenia Spectrum and Other Psychotic Disorder (F29)."

¶6 Yang shared many of Babbitt's concerns and in his affidavit, he repeated A.H.'s history of paranoia, insomnia, disorganization, hallucinations, and lack of self-care. Yang noted "[A.H.] was comfortable with conducting this interview in English and was competent in English." A.H. admitted using marijuana "once in a blue moon," but Yang ruled out substance abuse as the sole cause of A.H.'s condition. Yang found, "[A.H.] has no insight and as a result has moderately impaired judgment." A.H. denied having a history of mental illness and described the petition's allegations as either untrue or out of context. A.H.'s denials notwithstanding, Yang wrote A.H. "has also been religiously preoccupied, has felt that he has been dying from foods he eats and has gone to hospitals stating that his bones have been turned into Jell-O."

¶7 Both doctors found A.H.'s schizophrenia clouded his judgment and increased his risk of harming himself or others. They also agreed that A.H.'s inability to make informed treatment decisions necessitated court-ordered treatment.

¶8 During the hearing on the petition, A.H., two of his sisters, Mother, and both doctors testified. Mother recalled instances when she saw A.H. talking to himself and not making sense. She testified that she sent A.H. to rehab in Somalia for six months, hoping his symptoms would abate when he stopped smoking marijuana. A.H.'s older sister testified that "he's hearing voices" and affirmed A.H. struggled with completing his activities of daily living. She also saw him talk to a lamp. A.H.'s younger sister testified that A.H. would stare blankly, talk to himself, and struggle to hold a conversation. Babbitt and Yang's direct testimonies confirmed and reiterated their affidavits' conclusions. Babbitt updated her diagnosis from probable to definite schizophrenia.

**¶9**         A.H. testified in fluent English, reiterating his belief that he is not sick and that he does not need medication because he did not "want it to alter [his] mind." A.H. stated he immigrated to the United States at age six and attended American schools. A.H. was unable to articulate the differences between Somali and American cultures beyond mere generalizations, e.g., that "[Somalis] are more quiet," or that "[Somali and American English] are two different languages."

**¶10**         The superior court ordered A.H. to undergo a treatment program of no more than 365 days, with no more than 180 of those being inpatient. A.H. timely appealed, and we have jurisdiction under A.R.S. § 36-546.01 and A.R.S. § 12-2101(A)(10).

## DISCUSSION

**¶11**         A.H. asks us to vacate the superior court's order because the doctors' evaluations failed to properly consider his "different linguistic, socioeconomic, and cultural background." *See* A.R.S. § 36-501(12)(a) (evaluations must include considerations of "identity, biography and medical, psychological and social conditions"). He contends the affidavits are facially insufficient because the doctors based their conclusions solely on their observations without also studying this necessary information.

**¶12**         Governmental power to involuntarily commit an ordinary citizen to confined treatment in a mental hospital implicates a "massive curtailment of liberty" as well as the potential for "adverse social consequences," thus requiring adequate due process protections. *Vitek v. Jones*, 445 U.S. 480, 491–92 (1980) (citations omitted). We do not review this application of Arizona's process lightly.

**¶13**         A court shall order an individual to undergo involuntary treatment if it finds, by clear and convincing evidence, the individual is acutely or persistently disabled due to mental illness. *See* A.R.S. § 36-540(A). We will affirm an involuntary treatment order supported by substantial evidence and will not set aside the superior court's findings unless they are clearly erroneous. *In re Appeal in Pima Cnty. Mental Health Serv. Action No. MH-1140-6-93*, 176 Ariz. 565, 566 (App. 1993).

**¶14**         Two evaluating doctors must separately: (1) conduct an evaluation, § 36-501(12); (2) explain the evaluation in an affidavit, § 36-533(B); and (3) if requested by either party, testify about the evaluation and diagnosis process at the court-ordered treatment hearing, § 36-539(B). We independently review whether a doctor's affidavit is legally sufficient. *In re MH2011-000914*, 229 Ariz. 312, 314, ¶ 7 (App. 2012). A "defective affidavit"

can be cured through supplemental testimony. *See In re MH2007-001236*, 220 Ariz. 160, 167, ¶ 20 (App. 2008). The doctors' testimonies must be to a reasonable degree of medical certainty or probability to prove the elements for involuntary treatment. *Id.* at 169, ¶ 29.

**¶15**     Both doctors here conducted evaluations, explained their evaluations in affidavits, and testified about their evaluations. The doctors' evaluations, affidavits, and testimonies taken together reflected their consideration of the statutory factors. *See* A.R.S. §§ 36-501(12), -36-533, -36-539. Both doctors confirmed they read and relied on the allegations in Mother's application in making their diagnoses. Therein, Mother described A.H. as "religiously preoccupied," and highlighted his failure to maintain personal hygiene and his refusal to acknowledge his need for help. Yang listened to the family's testimonies before testifying and thus had additional information about A.H.'s background and social conditions when he testified to his conclusions.

**¶16**     A.H. appears to contend that his cultural and linguistic background explain his behavior rather than his mental illness diagnoses. But Mother and his sisters share his cultural background and yet found his behavior sufficiently concerning to pursue and support court-ordered treatment. Assuming, without deciding, that the affidavits insufficiently considered A.H.'s background, both doctors sufficiently supplemented any deficiency through testimony. The record contains substantial evidence to support the superior court's order.

**CONCLUSION**

**¶17**     We affirm.



AMY M. WOOD • Clerk of the Court
FILED:     AA